any way?

A I think any student that is challenged in a rigorous environment such as Colombia Heights or any school for that matter will definitely help the student be more successful in their post-secondary career or in college.

Q What about right now for [redacted]

A Right now it definitely is. We are a rigorous community and that's part of our mission. It's part of the things that we do. It's part of the work that I do when I'm working with my teachers to ensure that they are providing that rigorous environment so that all students, not just [redacted] is challenged.

Q Okay.

MR. NABORS: No further questions.

MR. SEAT: Okay. Thank you. Any redirect?

MR. STEVEN: Just one I think.

REDIRECT EXAMINATION

BY MR. RUBENSTEIN:

Q So you were asked about different cohorts. When [redacted] was with his initial cohort of SLS or specific learning disabled students, was [redacted] receiving 26.5 hours

of specialized instruction?

A He was.

Q Okay. And was he with the same special education teachers as the BES cohort?

A Yes, he was.

Q Okay. So the rotations were staggered, is that how it worked?

A Yes, they are slightly staggered. We have three rotations with the three sets of teachers or four rather. Each period the students take a different teacher. And with [redacted] when he was with the SLS group, he actually started first at the time with science and then he moved to English and finished with math and then went to Chinese. Now, he's with the -- his rotation starts with English and then they move English, math, world history and then move on to PE. So it just -- it's the different rotations, but it's the same group of teachers that he works with. They are all highly qualified specialized instructors.

Q Okay. And was -- the decision to move him from the SLS cohort to the BES cohort, was that made as part of the team with mom present?

A Yes, mom was present.
Q Okay, thank you.
MR. RUBENSTEIN: That's all I have.
MR. SEAT: Okay. I've got a couple of questions. So picking up on what Mr. Rubenstein was just asking you: when [redacted] was in the SLS cohort, was he at a lower level of content than what the BES -- or is it the same level of content?
THE WITNESS: So he was actually doing the same content like any other ninth grader. So the SLS classes are ninth grade cohort of students. They are all taking algebra 1. They were all taking English 9. They were all taking biology and they were all taking Chinese 1. It was a cohort.
In fact he had no infractions until he had the one physical altercation with one of the students. And that was because the student was sitting in a chair that he wanted to sit in and that was the reason why there was a physical altercation. That was the very first one and it occurred sometime in the middle of September, if my memory serves me correct, or thereabouts. But the student, again, even before then, he was receiving the

supports that he needed.

MR. SEAT: And the content was complex or just as complex as in the BES?

THE WITNESS: Yes, sir. Because I didn't -- we have not changed his curriculum except for changing the cohort of students that he's with so that he could have a behavior tech with him.

MR. SEAT: And so then in the BES cohort he's the only ninth grader, is that right?

THE WITNESS: That is correct.

MR. SEAT: And so he's the only one that's getting biology and the rest of the class is getting chemistry?

THE WITNESS: That is correct.

MR. SEAT: Okay.

THE WITNESS: And it's the same thing -- he's in English 9 and the rest of the cohort is in English 10.

MR. SEAT: Okay.

THE WITNESS: And in his history class, he's in world one and the rest of the class is in world two.

MR. SEAT: And so how are these cohorts set up? I mean how many different cohorts are there for the BES

classes?

THE WITNESS: We only have one.

MR. SEAT: And it happens to be 10th grade?

THE WITNESS: Yes, because the -- it just so happens that when we started the cohort, we started them when they were in middle school, so many of the students have been together since seventh grade.

MR. SEAT: Okay. And about how many students are in the BES cohort?

THE WITNESS: On record we have seven.

MR. SEAT: And then in practice?

THE WITNESS: I mean we have attendance -- you know, that come to school. But on record we have seven.

MR. SEAT: And sometimes you have seven at school? I mean the way you said it it sounds like maybe there's three or something that --

THE WITNESS: Oh, no, no, no.

MR. SEAT: Okay.

THE WITNESS: They are there. On record we have seven.

MR. SEAT: Okay. And so if [redacted] is able to master the material easily, are there ways of challenging

him more -- I mean without even getting into the nuances of AP and UDC and such? I mean are there ways just to challenge him more?

THE WITNESS: And so that's a great question because that's a lot of the work that I've done, especially since math is one of his areas of strength. I've worked side by side with both my -- all of my teachers, but specifically in math to make sure that when she is giving him instruction she's not watering down the curriculum or giving it too many scaffolds; that instead of, say -- instead of doing x plus b equals c, just humor me for a second and trying to step it all the way out and then teaching it one little piece, one little piece, like really just teach it to him and let him wrestle with the content and see what other supports and only support him when he is at a place where we need to move him along for frustration.

And that -- so in other words, not necessarily over scaffolding. Because at the beginning when he was really, in his words, bored or wasn't felt as challenged in math, it was because some of the work that she was giving him was just scaffolded so far down that it was

very easy for him to move from A to B to C. And without making it so simplistic for him, make it so that it looks more like what he would receive from his -- if he was next to his peers. So making it look the same way that she does it for the other students in 10th grade who are at a higher level, making sure that she is not scaffolding it too far down.

MR. SEAT: Okay. Because if he's the only student getting ninth grade courses -- and it seems like it would be one-to-one I mean tutoring basically that could be adjusted to whatever he can handle.

THE WITNESS: And that's what I mean. Like before she was making it very simplistic. So, for example, if they were doing linear equations and -- to solve a linear equation, maybe he had to do 2 times x plus c equals 12, just humor me for a second, when b is 2 -- like giving him -- that type of a problem was too simple for [redacted] because the numbers were -- he could do that mathematical problem in his head and come up with what the answer is.

However, if you're making it more complex or you're giving it to him in a word problem form where he

has to kind of figure out what would A equal or what the term does he need to use for B to solve the equation, it's more complex for him because now he has to read and digest it and come up with a solution or come up with a pattern for solving rather than just giving it to him.

MR. SEAT: So why hasn't this solved the problem and why are we still here talking about getting in challenging enough work for him?

THE WITNESS: Part of that is because that -- it goes to what I said before: it just depends on where he is from a behavioral standpoint on that particular day. So even if you make the work rigorous for him, his behaviors do impact his ability to access the curriculum. If he is not ready to receive it, he's not going to engage in the content.

MR. SEAT: Which is why he is in special ed. I mean that's why he is ED, right?

THE WITNESS: Correct, that's why he's in the most restrictive environment at our school.

MR. SEAT: But in terms of the challenging curriculum, then it seems like you ought to be able to address that and it seems like you would have addressed it

trying to deal with this.

THE WITNESS: Correct.

MR. SEAT: When did he move into the BES program from SLS?

THE WITNESS: About September. I can double-check the date, but it should have been around September.

MR. SEAT: So it's been a long time?

THE WITNESS: Uh-huh.

MR. SEAT: And yet here we are. So the UDC Early College courses, is it common for ninth graders to take any of those courses or what grades do you usually see taking those --

THE WITNESS: They usually start in 10th grade. There are -- there have been a few that may have -- the -- let me double-check. Most of the students who participate in UDC have started in the 10th grade. There has been one student who has done UDC courses in ninth grade, but she also was with -- she is a student that has been with CHEC since she was in the sixth grade and so she took early high school courses when she was in eighth grade. So she was already ahead of her ninth grade peers.

MR. SEAT: Okay. And so then for [redacted] to do it

next year, you said that you are definitely encouraging him to apply for next year?

THE WITNESS: Yeah.

MR. SEAT: And then that has nothing to do with CHEC, but it's between him and UDC?

THE WITNESS: Uh-huh.

MR. SEAT: Is that what you testified? You need to say yes for the record.

THE WITNESS: Yeah, I'm sorry, yes. We have the applications. We have a UDC coordinator that works with the students for early college. But he applies. And we will work with UDC in terms of -- from a coordination standpoint.

MR. SEAT: Okay. And then you were saying you discussed with Ms. Smith AP biology and that was definitely an option and that that would be attending inclusion classes. And so was that definitely an option for next school year or for this school year?

THE WITNESS: It would be next school year, not this year, because the year is over.

MR. SEAT: Right. And even at the time you were talking to her was it for next year --

THE WITNESS: Yes.

MR. SEAT: -- next school year? Okay. And so then -- I think you've answered parts of this and maybe all of it, but why is it that [redacted] would need to be in the inclusion classroom as opposed to it being taught to him in the BES program?

THE WITNESS: The BES program focuses around making sure that students have supports when it comes to the fact that their behavior impacts their ability to learn, and [redacted] has demonstrated that on a number of occasions based on his referrals and infraction where, despite the content being rigorous, he will make choices that prevent him from accessing the content.

MR. SEAT: And so then why couldn't the AP biology be taught to him in the BES classroom?

THE WITNESS: Because the student -- the teachers who teach specialized instruction are not content specific teachers. That course has to be taught by a content teacher. We're -- as I said before, we're an AP for all school and the students are all allowed to have access to any of our AP classes and those AP classes are in the general education setting with the peers with a

special education teacher supporting him in the classroom.

MR. SEAT: Okay.

THE WITNESS: And the teachers in that setting they are co-teaching with the teachers. They are in the rooms with them. They are adapting or making the -- not necessarily adapting because they can't adapt the content for AP. But they are making sure that the students if they need something re-taught, they can re-teach the student. And that's all done inclusively.

MR. SEAT: Okay. And so if [redacted] could go in the classroom, then he could get the AP class that way. And the team thought he wasn't ready for that, right?

THE WITNESS: Correct.

MR. SEAT: And do you think that he is moving in that direction -- I mean do you think he will be next year, for example?

THE WITNESS: I think that [redacted] is going to do what [redacted] wants to do based on what [redacted] wants to do on that particular day. I say that to mean that [redacted] has the aptitude of being successful in an AP class. He has the aptitude of being successful in a biology class. Whatever class you offer to [redacted] he has the attitude of being

successful. [redacted] decisions on any given day, at any given time is what prevents him from accessing the content, whether it's in the BES room or in a general education class.

MR. SEAT: Okay.

THE WITNESS: And [redacted] has made some progress -- he has made progress. I'm not going to sit here and say he has not. He has made some progress over the course of the year. A lot of the reason why I'm going to say that he has made is because he's starting to allow the team -- he's starting to trust various members of the team. Is he in a place where he's completely trusting of us? Perhaps not. But he is starting.

MR. SEAT: Okay. And earlier in your testimony you said that he was having lots and lots of infractions, multiple infractions a day I think you said.

THE WITNESS: Uh-huh.

MR. SEAT: But then you also testified I thought that he didn't have any infractions for the first month of school or so?

THE WITNESS: No, the first month of school he had no infraction. He was a model student. He was quite,

didn't say very much and he was obedient. He was the perfect angel. Sometimes it's -- within the first month of school in education -- we call it the honeymoon period and the students, you know, they are the sweetest. And by the 30th day, I don't know what happens. We start to see who the real students are.

And so -- and I think because [redacted] -- again, it all had to do with a chair that he felt was his and he is an individual who can be a little territorial. So if you go into any of his classrooms right now -- and this is going to the end of the class -- the school year, [redacted] has a specific seat. "This is my seat. This is my computer. This is where I'm going to be. This is my space." And he has hold fast to -- that is where he is.

MR. SEAT: Okay. You mention that you are a project based school and that he was doing GRASPS work. And I want to make sure I got the word right. Was it GRASPS, GRASP?

THE WITNESS: It's G-R-A-S-P-S, GRASPS.

MR. SEAT: It is GRASPS?

THE WITNESS: Yeah.

MR. SEAT: Okay.

THE WITNESS: And it's actually a abbreviation and it stands for goals -- don't worry about it.

MR. SEAT: Okay.

THE WITNESS: I can't remember right now. I got stuck on the R. But it basically -- it gives the students the activity or an actual goal, the activity that they are going to do --

MR. SEAT: Okay.

THE WITNESS: -- the situation. It gives them who they are going -- who the audience is, who they are going to be talking to. And it just makes it very relevant to what the activity is going to be at the end of the day.

MR. SEAT: Okay. I know that -- I thought I had heard GRASP, but I wasn't sure if that made sense, and so that's helpful to know it's an acronym. You said that math is one of [redacted] strengths, but he has three other students that are higher than him in his class. And so that confuses me. If he's the only one getting the ninth grade math instruction in his class, how there were three others that were higher?

THE WITNESS: So if I look at [redacted] educational

assessment and I can compare it to the other students' educational assessment, the other two -- three students outperform him based on their educational assessments.

MR. SEAT: And so that's in the whole ninth grade?

THE WITNESS: No.

MR. SEAT: So it's not in the BES classroom?

THE WITNESS: That's in -- I was only focused on the -- out of the seven students in the BES.

MR. SEAT: Well, but they are all 10th graders, right? So is that why they are doing better?

THE WITNESS: Not necessarily, because their strength is also math. And so, for example, when we look at the educational standard scores, they outperform him when we compare their standard scores. If I were to compare [redacted] algebra performance to the rest of the school's performance for algebra, then [redacted] is not one of the higher performing algebra students. In fact he is towards the bottom.

MR. SEAT: In ninth grade?

THE WITNESS: Yes.

MR. NABORS: I think we need to note an

objection. We're going to object and move to strike the testimony regarding [redacted] compared to other students. I think that violates the IDEA's requirement that the students need to be based upon individualized needs of the students instead of comparatively on other students.

MR. SEAT: Well, I think it's relevant and I overrule the objection, because if the notion is that he can't be challenged then the other students will be relevant. But I'm kind of confused by the testimony that I got and felt like it helped your side more than DCPS.

MR. NABORS: Well, I think I'm still confused too. I just don't -- I really didn't understand it. I wanted to make sure that my objection is on the record, though.

MR. SEAT: Okay, so noted. I think that's all my questions. And maybe if I screwed up some things for counsel, do you want to follow up on?

MR. NABORS: No, sir.

MR. SEAT: Okay.

BY MR. RUBENSTEIN:

Q What do you mean that he's one of the lowest performing in algebra from what you've seen?

MR. NABORS: So we're -- we will object again.
MR. SEAT: So noted. But you may answer.
THE WITNESS: So coming off -- when we are looking at the interim assessments for algebra and I'm comparing the performance of my special education students who are in algebra 1, I can look and see where his performance scores are. Many of my students in my inclusion setting are outperforming him based on their overall performance on Agile Mind is what I'm referring to, their placement on standardized test scores.
MR. SEAT: Okay. Anything else?
MR. RUBENSTEIN: No, that's it.
MR. SEAT: Okay.
MR. NABORS: I just have something real quick to follow-up, Mr. Seat?
MR. SEAT: Sure.
MR. NABORS: I apologize.
RECROSS EXAMINATION
BY MR. NABORS:
Q So where are these other students on the WJ III?
A They are actually lower than [redacted] on the W III or something if I'm comparing them, the ones who are in

inclusion.

Q And did [redacted] have any attentional issues when it came to sitting and taking the computer assessment algebra?

A Not that I know of. Because he actually sits down and takes the exam. I was in his room monitoring this last week when he didn't have no problem.

Q Okay, thank you.

MR. SEAT: Okay. Anything that we need to deal with?

MR. NABORS: No, sir.

MR. SEAT: No, it's fine. I'm glad you're involved, Ms. Smith. I mean this is all about your son after all. So you're all set?

MR. NABORS: Yes, sir. Thank you.

MR. SEAT: Okay. So that concludes your testimony, Ms. Hinkson. So you're now completed and off the witness stand. And so please don't speak to anyone about your testimony as it's confidential, as you know.

THE WITNESS: Yes, sir.

(Witness excused)

MR. SEAT: So anything else, Mr. Rubenstein?

MR. RUBENSTEIN: No, we will rest.

MR. SEAT: Okay. And any rebuttal testimony?

MR. NABORS: No, sir.

MR. SEAT: So then all we have left is closings and --

MR. NABORS: Really? Then I could do a written closing.

MR. RUBENSTEIN: I was going to say it's a unique issue and perhaps a written closing might be warranted in this case.

MR. NABORS: Hold the presses. Mr. Rubenstein disagreed to a written closing.

MR. RUBENSTEIN: Well, I didn't say that.

MR. SEAT: So I'd be open to getting something in writing if it was soon and I'm not sure how soon you could get something in. But I also wonder if it might be helpful to do some oral closing as well so that I can have some conversation and help focus on what I'm concerned about or questioning and not just -- you know, because sometimes written can just kind of miss all the questions I still have in my mind.

So if we had a little bit of oral --

MR. RUBENSTEIN: Sure.

MR. NABORS: Sure.

MR. SEAT: -- and then if there's some particular issue, I mean that might help to narrow down the, you know, one particular issue that you could then do something more quickly on and get it to me while I'm still working on the HOD.

MR. NABORS: Okay.

MR. SEAT: If that make sense.

MR. NABORS: Yes, sir.

MR. SEAT: And so why don't we take a few minutes so you all can get your thoughts in order, I'll look at my notes and get my questions in mind too and then we might come back in 10 or 15 minutes and do closings.

And I'm not sure how long we want the closings to be. I mean I normally do 30 minutes on each side. If -- I mean as a max. It doesn't have to go that long. But -- and maybe it makes sense just to keep that and then see what makes sense for written, any sort of follow-up on briefing, whatever you might want to brief after that. Does that make sense?

MR. NABORS: Yes, sir. And really we only need as much time as it takes to answer your questions, really.

MR. SEAT: Okay.

MR. NABORS: We can keep it in short, if need be.

MR. RUBENSTEIN: Yeah.

MR. SEAT: So shall we come back in 10 minutes?

MR. NABORS: Wonderful.

MR. RUBENSTEIN: Fifteen.

MR. SEAT: Fifteen minutes?

MR. RUBENSTEIN: Yeah, I have to use the restroom.

MR. SEAT: Okay, so come back then at 2:25. And we will go off the record now.

MR. NABORS: Thank you, sir.

(Recess)

MR. SEAT: Okay, so we're back on the record at 2:27 in case 2016-0023 and ready for closing arguments. And do you want to reserve a particular amount of time to have the last word or see what's left off of the 30 minutes?

MR. NABORS: I'll reserve 10 minutes.

MR. SEAT: Okay. So that would be -- 47 will be the first 20. Okay. If you're ready, I'm ready.

MR. NABORS: Yes, sir. So we're talking about a very complicated student, a student who is capable of achieving a lot, but who is also struggling to contain a lot of behaviors. It seems a lot of this is undisputed: the student is capable of not only at grade level but above grade level work, but he has serious issues managing his anger and dealing with frustrations.

So one of the biggest things -- I guess the primary reason that we are here is that we would like to ensure that he has a curriculum that has been designed to challenge him and the reason why is because we've seen very positive results when he is challenged.

And for us, we think of this as a positive behavioral intervention: that is the rigorous curriculum, the challenge in academics, they not only engage his interest, but they allow an outlet of his intellectual and physical energy in a way that is not only rewarding for him personally but also very productive in preparing him for a life beyond the IDEA.

And so while AP is really the phrase that has

been coming up, what we're looking for is more of the advanced programs, not just the advanced placement class but -- you know, for instance, in some high schools they have honors and they have AP and they have IB. Something along that spectrum of where it's challenging enough to where [redacted] is engaged and he wants to make a positive contribution.

We heard about after the honeymoon period in September. Then he was a holy terror. That was when he was in the SLS program. He was with students who had specific learning disabilities. He wasn't with students that had emotional disturbances.

Now, the reason why we have these different classrooms, BES versus the SLS, is because students have different kinds of needs. With SLS what we're talking about is learning disabilities. With BES we're talking about emotional disturbance.

And so we saw a drop off, really not a huge one, but a drop off nonetheless between when he was in the SLS program and when he is in the BES program. So now that we've got him in the BES program, where he should be, we need to get the curriculum modified appropriately -- and

that's the whole purpose of the IEP. And that's why we came to you asking for an order that the IEP be amended -- well, to be designed to ensure that he has sufficiently rigorous coursework material, academics in general to keep him engaged in an effort to implement that positive behavioral intervention and prevent some of these really challenging manifestations of his disability.

MR. SEAT: So it seems like where he's back in BES where he's the only ninth grader that it's essentially one-on-one tutoring, and if they are doing it well, it seems like they would be challenging him just in -- every day, every course even if it didn't have fancied labels attached to it. I mean even if it's not AP or IB or honors, that still would be challenging. So he's actually learning stuff, actually progressing and interested and engaged. So I mean I hear the school saying they are trying to do that. It seems like that's what they should be doing.

And so then it seems like that -- I'll address your concerns in terms of IDEA: is if they are giving him one-on-one specialized instruction tailored to what he can handle and needs, it seems like it ought to be a happy

situation, we wouldn't be here.

MR. NABORS: Right. But that only work to an extent. And admittedly, you can get this one-on-one setting where you're getting taught everything. But if you're getting taught to the point where really what you're doing is comprehending the advanced placement material and you're able to compete at the advanced placement level, you ought to be able to sit for the advanced placement exam. Why? Because [redacted] wants to go to college. [redacted] is capable of going to college now in the ninth grade.

We heard about the early college courses. So the whole access to the advanced placement program isn't just about getting this material. It's also about some of the other benefits that come from that program, mainly being able to sit for the AP exam. So [redacted] ought to be able to do that.

If [redacted] is capable enough to get the work -- and if really with this specialized setting that he's being provided, they can deliver the very challenging curriculum to him and he can digest it and he can master it, then shouldn't he be allowed to take the AP test?

MR. SEAT: Well, they said they can't deliver the AP curriculum, which comes as a package I was told and has to be delivered as a package in a certain way. It can't be modified and that they don't have special ed teachers to do that.

MR. NABORS: Right. So they are denying him the access to the placement because of their limited resources. I guess that's what I'm understanding that. You can't do that. You can't say, "Look, you don't get that even though you need it because we don't have it, sorry." We kind of went through all of that with Blackman-Jones (phonetic). You need to get somebody there who is capable of doing that.

But even more, CHEC's whole idea is being this challenging curriculum. There's an expectation that all 11th and 12th graders are going to take AP courses. If [redacted] is --

MR. SEAT: At least AP English?

MR. NABORS: Okay. So then let's just look at the AP English. And if [redacted] is up to grade level with AP English in 11th and 12 grade and he's capable of receiving it -- I mean he will be with his 12th grade cohort

receiving AP language, shouldn't he be able to receive that? They are just going to say, "No, even though everybody else in the entire school gets to get it, but because you have to receive these services in the BES setting, you don't get it." Isn't that just pure and plain discrimination?

MR. SEAT: Well, if it's discrimination of an ADA sort, then it's not a claim that's suitable here. I mean he just has to have good enough education under the IDEA. It's not a discrimination focused issue. But I mean you raise 12th grade. I'm not sure where he will be in 12th grade if his --

MR. NABORS: No, in the 11th grade he will be with the 12th grade cohort.

MR. SEAT: Yeah, yeah.

MR. NABORS: Because he has been placed one grade ahead --

MR. SEAT: Right.

MR. NABORS: -- with the BES cohort.

MR. SEAT: Yeah. And so that raises the question of what happens to him in 12th grade, but I guess that's a question for another day.

MR. NABORS: So, you know, I thought about this and your reading of the Dear Colleague letter is different than ours. But there's this line here: "Participation by a student with a disability in an accelerated class or program generally would be considered part of the regular education or the regular classes."

So when you have CHEC, CHEC expects even the special education students to participate in advanced programs. Advanced placement is a part of the regular curriculum there.

MR. SEAT: In 11th and 12th grade?

MR. NABORS: Well, definitely for AP English in 11th and 12th grade.

MR. SEAT: Yeah, which they apparently never done yet for special ed. So they are trying to figure it out.

MR. NABORS: The expectation is there. And I think when you look in general at CHEC, CHEC isn't just kind of like a general ed program. It is this accelerated challenging curriculum. It's supposed to be college preparatory. And if we're looking at the kind of education that all the other students are getting and in

the context of [redacted] what is [redacted] getting? We even heard testimony that the students in the special education program are challenged too.

MR. SEAT: Right.

MR. NABORS: But they are expected to go forward.

MR. SEAT: Including [redacted]

MR. NABORS: Including [redacted]

MR. SEAT: I mean they say he is now being challenged. And so I mean I don't know if there's anything in IDEA that requires AP courses and you certainly don't have to take AP to go to college.

MR. NABORS: You don't have to.

MR. SEAT: You don't have to pass AP to get into college.

MR. NABORS: Right. But the only reason he's being denied it is because he needs the services. You know, he needs 26.5 hours of specialized instruction and 1 hour of BSS a week. That's the only reason he can't take the AP courses.

MR. SEAT: I mean if look that from the other side, it's because his behavior is such that he can't

handle the AP classroom. Otherwise he would be in the AP classroom with the AP instruction, getting the AP tutoring for the AP test. And so, you know, maybe he will get there.

MR. NABORS: But isn't that -- the whole conditioning enrollment in advanced class or program on the forfeiture of needed special education related aids and services is inconsistent with the principle of individualized determinations? I mean this student's individualized needs say, "I'm there intellectually, but behaviorally I just need the support."

MR SEAT: And so they are supposed to have an AP teacher that is able to do special ed?

MR. NABORS: They can co-teach. I mean if you have a special ed teacher and a AP teacher -- that's what their gen ed inclusion AP classes are anyways.

MR. SEAT: Right.

MR. NABORS: So an AP teacher can just rotate in for one period a day with the BES cohort to teach it. And it's not like it's inflexible here. And the AP teacher could teach the gen ed portion of it too. If you're really thinking about how [redacted] cohort is set up, Ms.

Hinkson explained that there's three parts that are going on there: there's this rotations, right? And the whole reason why we got into this testimony about whether these are highly qualified educators is because the cohort is broken up into three groups. The behavior tech is with one, the teaching aide is with another and then there's the special education teacher, right?

So really when you think about it, that a 10th grade education curriculum and then you have [redacted] and [redacted] has to be taught something completely different from all the rest of the students, right? So if we just assume that the teacher splits it up 50-50, "I'm going to teach the 10th grade curriculum for half the class and the 9th grade curriculum for half of the class." Even though that doesn't make sense, let's just assume for the sake of argument. That means that [redacted] is only getting half of the hours of specialized instruction that he needs. There's only one teacher, but there's two curriculums, two completely different curriculums that she has to teach.

So we start off with that big problem with all of this. So when you have an AP teacher who is -- who could rotate in and the special education teacher could

co-teach with -- it doesn't mean the special education teacher has to parrot every single word that the AP teacher does. Just it means that the special education teacher has to be present to ensure that the curriculum is modified and adapted to [redacted] And that's not too much to ask.

You could have a gen ed AP teacher come in and co-teach with a special ed teacher when the 10th grade cohort is receiving its general ed instruction and the 10th grade material and [redacted] is receiving, you know, the 9th grade material. That's entirely plausible. It's entirely possible of a scenario. But it has never even been explored as an option.

MR. SEAT: And so if he's getting -- so your view is that if he's getting advanced academics, but it's not AP, then it's a violation of IDEA?

MR. NABORS: Yes, sir, because he is being denied the AP solely and exclusively on the basis of the needs that he has in his IEP.

MR SEAT: And there is no substitute that is sufficient for -- to satisfy the standard?

MR. NABORS: Well, if we're looking at Rowley

even -- I mean it's not -- I understand the Fourth Circuit and the DC Circuit have adopted this language of some educational benefit, but the Fourth Circuit recently clarified that some means meaningful.

MR. SEAT: Sure.

MR. NABORS: For [redacted] meaningful doesn't mean just the general ed curriculum. Meaningful means it's enough to challenge him. It's an integral component of his behavioral management. That's his behavioral -- and the positive behavioral interventions that we are talking about. That's the challenging curriculum we need to have in here. And so in order to meet the Rowley standard of meaningful for [redacted] it has got to push him a little.

MR. SEAT: Right.

MR. NABORS: And so I guess to get back to the question of whether or not it's AP -- in CHEC it sounds like all there is is the regular curriculum and there's AP. And if he's going to be pushed beyond regular curriculum, why isn't he in AP?

MR. SEAT: Well, so -- I mean that's the dichotomy that you make. But it seems like if they got somebody basically tutoring him, then they could ratchet

it up so it is challenging for him as he can handle.

MR. NABORS: Right.

MR. SEAT: And that wouldn't necessarily need to have an AP label on it for it to be meaningful and to challenge him and to keep him from getting bored?

MR. NABORS: Right. But let's say that they ratchet it up to the point where it's even more difficult than AP classes, where he by virtue of this ratcheting it up is more than capable of mastering the AP content -- he would have gotten a 5 on whatever AP class it was and he doesn't have a chance to even sit for the AP exam solely and exclusively because he needs 26-1/2 hours of specialized instruction, well, and the hour of BSS, that's not only discrimination to [redacted] That means that the curriculum that he's being provided is inherently unequal to that which children without disabilities are being provided easily, or -- and not even that, students who are in the inclusion setting are allowed to have.

So it's just because of [redacted] number of hours of supports he needs. And really the majority of his hours of support are behavioral. He has to have that, you know, emotional support.

MR. SEAT: Which sometimes help and sometimes doesn't help it sounds like.

MR. NABORS: We're not asking them to turn him into an angel.

MR. SEAT: Yeah. Okay. So then on the other issue of SLS, it sounded like he was doing fine there until he wasn't and then they shifted him into BES.

MR. NABORS: I don't think the timeline was that quick. But after the honeymoon period --

MR. SEAT: Well, that seemed to be middle of September on both items and I don't know if it's in the record. But I don't have it clearer from the testimony how quickly it happened. But it seemed like it was --

MR. NABORS: Right.

MR. SEAT: -- at approximately the same point that the honeymoon ended. He had the big problems over the chair and so he got shifted to BES thereafter.

MR. NABORS: So he was in -- let's just call it a BES program at LaSalle-Backus. He was in a self-contained program. That was where he had a dedicated behavioral aide. And there have been multiple characterizations of what the program was at LaSalle-

Backus.

But when he came into CHEC, there is no doubt at all that he was emotionally disturbed. There is never any question at this time that he did not have a specific learning disability. So it made zero sense to put him into the SLS program. But he got pigeonholed into it because of this cohort system, where the District is now attempting to streamline all of its self-contained programs where they start on a certain grade in different locations.

So when you look at the LRE requirements, it says, you know, not only does the student have to be in a least restrictive environment, but also the school that's in -- the school the student would attend if he were not disabled as well as the school that is closest as possible to the student's home.

This cohort system throws all that into disarray. And DCPS' response is, "Well, sorry, your cohort for ninth grade is an SLS program. Full-time means full-time even if you're in an SLS program. There you go, you're in it." It's not this kind of individualized determination as to the student's actual needs.

And they place him into a setting with a whole bunch of students who do not have the same kind of disability he does, who probably really were in all fairness more vulnerable to [redacted] then he was to them -- is the nature of his disability. And then lo and behold, there's this massive blow off and they have to move him into 10th grade, which is now the super awkward thing. I don't really understand what's going on with that.

The cohort system is the problem here. It's this half backwards result of the massive influx we had in our public schools in 2013. [redacted] should have never been put in a specific learning program. He didn't need specific learning supports. He needed to be in the BES program with support for students with emotional disturbance.

MR. SEAT: Right.

MR NABORS: And so we're just saying right off the bat, this determination it's definitely procedural, but it rose to the level that denied him FAPE because it completely and wantonly disregarded the individualized requirements for placement. It didn't look at what [redacted] needs were. It looked at how does the system -- I guess

where is space at in the system and then they threw him into it.

MR. SEAT: So -- I mean it seems like for a month they got by with it.

MR. NABORS: Yes. And we also heard testimony that -- and I think we've heard from many people inside of DCPS, many educators across the country that the first 30 days a student is in a new setting, almost all kids are in the honeymoon period and it's fine.

MR. SEAT: Yes, you see one thing and you see another. But --

MR. NABORS: Yeah. But then as soon as the honeymoon was over, then it got ugly and it got ugly fast. And I think our point here is that, you know, the whole idea that you could just put a kid into, you know, full-time means full-time type of setting is not compatible with the IDEA's individualized requirement. And so -- you know, yes, we acknowledge that there is the honeymoon period, but -- and that doesn't change the fact that it was inappropriate from the word go.

MR. SEAT: And so you would have had them put him in the 10th grade cohort for BES from the start?

MR. NABORS: No, I think we would have had them put him into a ninth grade BES program. But the problem is we weren't consulted or advised or even talked to about it. You know, this was what was assigned.

MR. SEAT: Right.

MR. NABORS: It came down by an LOS letter. When you're changing from a BES program to an SLS program, that's enough of a difference within the programs and the kind of students he's going to be around that it should at least trigger a PWN requirement when you get that. The LOS was: "Hey, welcome to CHEC."

MR. SEAT: Right.

MR. NABORS: And that's it. And so, you know, at the bare minimum --

MR. SEAT: Where --

MR. NABORS: Go ahead.

MR. SEAT: Where was there a ninth grade BES program?

MR. NABORS: We don't know. Under Eley versus District of Columbia and District of Columbia versus Kirksey-Harrington, it's on the school system to identify appropriate location of services where the student's IEP

can be implemented. And the school systems are very stingy about that information. You can call down to the placement office, you'll get absolutely nothing.

Milo Howard, who is very helpful, will not give you any information about where IEPs can be implemented or how they can be implemented. And indeed, we're being told at various BES programs that full-time means 20 hours and full-time means 27-1/2 hours. We don't even know any more what full-time actually means.

So there's no way for a parent to really be able to go through and say, "Oh, this is a ninth grade BES cohort at this school. This is the closest one to my house under the EBIS boundary system," you know, just typing the address. "Could I put my student in here?" That's not how it works. DCPS assigns, you get a notice, you know, there you go, tough cookies.

MR. SEAT: Okay. So that's your --

MR. NABORS: Thank you.

MR. SEAT: -- 20 minutes. And so let's shift over and comeback to you then. So you --

MR. RUBENSTEIN: Yeah, I'll start --

MR. SEAT: -- ready, Mr. Rubenstein?

MR. RUBENSTEIN: I'll start by stating that references to LOS letter, discussions with Milo Howard, all that stuff is not in evidence before you. Those are statements from counsel and you should disregard all of that.

The LOS letter is not in the record. His IEP from last year is not in the record. And there is no -- there's a significant body of case law about the IDEA indicating that the disability classification itself is not really what's critical. The disability classification is what gets you in the door for special education services and related services. And I'll provide citations of those cases later.

But student received his required specialized instruction hours when he began at CHEC. No evidence that he did not receive his behavioral support services mandated by his IEP when he started at CHEC. You heard that he did particularly well academically when he started in the classroom at CHEC. That's corroborated by his report card, which is at R --

MR. SEAT: Yeah, As and Cs.

MR. RUBENSTEIN: Yeah, right, exactly. And

there are some statements by teachers in terms of his first report card. Some teachers have issues with behaviors. Some says he's a pleasure to have in class and has an excellent initiative.

The team did meet and transition him to a BES classroom at CHEC. It was a team decision. His behavioral support services and special education services carried over. He was with the same teachers with the addition of a behavioral tech, who supported him in that BES cohort.

So our position is that CHEC provided him his IEP requirements. And, you know, the disability label itself, it's a red herring. The case law demonstrates that.

In terms of the AP issue, I think from just listening to the discussion, it's all speculative I mean. And that is because AP math, as we heard, is a class that requires several prerequisites, which [redacted] is not taking. If you listen to some of the IEP meetings, the team agrees that moving him to an AP calculus without those prerequisites would not be in his best interest.

The only evaluation before you in this case is

at R-1. And there is no doubt [redacted] is a bright kid, but he is a kid who according to his last Woodcock-Johnson is within the average range across the board. He's slightly lower average in reading and written expression and he's in the higher average range in broad math.

So looking at the standard scores, he is in the average range. There's no indication that he's superior or exceptional in terms of his Woodcock-Johnson. I think that's why the special education team at CHEC offered to do a psychological evaluation after this complaint was filed to determine what his cognitive abilities are, what his current education abilities are, and that way they could program for him moving forward.

What you did hear from Ms. Hinkson is how the team did work to address the curriculum for [redacted] in his classes. You heard about the work Ms. Hinkson did with [redacted] and [redacted] teacher in his math class. And if you can look at R-4-2 for his second term, it seems to have worked because [redacted] got an A his second term and his teacher reported that he's a pleasure to have in the class. So the evidence here before you shows that [redacted] is being successfully educated in his classroom setting. Now, he's

passing his classes. He has a B average in algebra, B plus average in biology, a C in Chinese and a B in English.

And Rowley -- and we would also point you to a case out of the Fifth Circuit, Klein (phonetic) case, which we will provide the citation for later. Basically, the Supreme Court says that making -- progressing from year-to-year, passing classes is evidence of educational benefit. And we believe that there is certainly evidence of educational benefit here in the record.

Of course the Klein case also says that disability remediation is not one of the IDEA's purposes. And here we've heard a lot about behavior. It's undoubted that [redacted] behavior is part of his disability. You'll hear some of the meetings were manifestation meetings, where [redacted] acted out and the team met to discuss whether his behaviors were manifestations of his disability and the team agreed multiple times that they were.

And so he was not suspended because of that. So the team has met its obligations under IDEA of putting forth and considering positive behavioral interventions. Those are the behavior intervention plan and the safety

contracts that are in the record. There is no obligation for those interventions to work. The team has to consider them and put them in place. They did.

There is evidence that [redacted] behavior while it was still challenging, the frequency of the incidents has dropped slightly. We heard that they are still intense, but the frequency has dropped. Ms. Hinkson was very credible in stating as much on direct testimony her experience with his behaviors.

The evidence is that it's not necessarily the content of the curriculum in the classes, the educational challenge that's what's causing these outbursts. Many of them happen in transitions. Many of them are personality based. Many of them are occurring when he is not taking his medication and says as much to the school.

So the evidence is not that he's not being challenged. The evidence is that he has challenging behaviors that are a part of his disability.

As far as the AP is concerned as well, there's no evidence that the team denied him going into AP classes because of his disability. You heard from Ms. Hinkson that AP biology would have to be started maybe -- or

started at the beginning of the year, which was not possible for [redacted] at that point in time. The AP biology class was what the team discussed in the December meeting as potentially the best option for him.

And the team did not say that he would have to forego all of his special education hours. As you heard from Ms. Hinkson, children with IEPs take AP classes at CHEC. They can be provided and supported with a special education teacher pushing in. But again, that's all speculative because of --

MR. SEAT: But his IEP is always -- I mean it's 26.5 pulling out.

MR. RUBENSTEIN: Right.

MR. SEAT: And not any pushing in; something that would be --

MR. RUBENSTEIN: Right. So it's a team decision that if he could be in a general education AP class then the team would have to figure out what supplementary aids and services would be necessary to support him in that classroom setting. I think that what you've --

MR. SEAT: If he could handle push in.

MR. RUBENSTEIN: Right.

MR. SEAT: Which --

MR. RUBENSTEIN: And the team also agreed as of October 8th, which is when his IEP was developed, that he couldn't handle that at that point in time. And that's in Mr. Galenker's notes. So the team -- and the IEP was developed and you have --

MR. SEAT: Right. And so an argument: so then the AP ought to be provided to him on a pull-out basis?

MR. RUBENSTEIN: Well --

MR. SEAT: Which may be where you're going.

MR. RUBENSTEIN: Well, I think that the obligation is for him to -- specialized instruction is for him to access the general curriculum. He wasn't in -- he wasn't ready to take AP classes at that point in time. He was taking ninth grade classes and the teachers were modifying instruction to allow him to access those general education classes he was in for the ninth grade year.

I would point out there's a Supreme Court case; it's a Rehabilitation Act case. It's Southeastern Community College v. Davis. I don't know -- I'll provide the cite later. But I think that that case stands for the proposition that if modifications are impacting a general

education class to a degree where that class is significantly compromised, then it may not be the appropriate educational opportunity for the student. It dealt with a college level class. It was a 504 case.

But I think that that is something the hearing officer should consider. So -- I mean the team did not think that general ed classes were appropriate for him as of October, so the team did work to modify the curriculum and make it more demanding for him in his special education setting. We believe that that was an appropriate intervention, certainly allowed for the minimum for -- under Rowley. And we believe that DCPS has not denied [redacted] a free and appropriate public education.

MR. SEAT: Okay. And so that case you were just citing, Southeast Community College, I mean modifications impacting a general ed class would be a push-in situation, which we don't have here under his current IEP.

MR. RUBENSTEIN: Right.

MR. SEAT: So why would I need to get into that?

MR. RUBENSTEIN: I mean I think if we're talking about AP classes changing -- I mean you heard from Ms. Hinkson that they are specific content. And if the class

has to be reorganized to such an extent, then it's not necessarily perhaps appropriate for that child. So keeping in these ninth grade classes -- I mean, again, talking about AP was premature. Putting him in an AP class middle of ninth grade year before he had even finished algebra, that would have been a disaster, the team agreed to that.

AP biology was not possible. AP English was not really a consideration for the team. So the team did what it could with his ninth grade classes by making them more demanding for his academic skill set.

MR. SEAT: Okay. Anything else?

MR. RUBENSTEIN: No.

MR. SEAT: Let me -- so what about the decision to put him in with the SLS program at the beginning of the school year? Wasn't that clear that it wasn't the right fit for him?

MR. RUBENSTEIN: He did well in it. I mean there's no obligation you have to be with children of the same disability classification under the IDEA. You have to get the services that are tailored to you. And we heard that he did well with those services in place.

MR. SEAT: One of the argument was that it was not tailored to him. That he was --

MR. RUBENSTEIN: But --

MR. SEAT: -- put in where there was an opening.

MR. RUBENSTEIN: But there wasn't -- I mean he got the services that were required by his IEP. So he got the special education related services that prior IEP teams had determined to be required for him. And so putting him in a separate classroom where he was able to receive those services is appropriate.

I mean the obligation is not to put him with similarly disabled children. It's to make sure that he's getting his service in accordance with his IEP. And again, if you do find that to be a procedural violation, he did well academically. Once the issues arose, the team acted accordingly and put him in a setting -- a BES program setting with a behavior tech.

MR. SEAT: So then what's your thought about Mr. Nabors' concern that if he was getting really advanced instruction that it would be such a detriment not to be able to take the AP test and credit for all the advanced learning that he has had?

MR. RUBENSTEIN: I mean I'm not really certain I -- again, I think that that's looking way ahead into the future and it's not really before you in terms of his ninth grade year. Certainly, if he takes AP classes and sits for them, we want him to do well and prepare him for those classes. But that's not really where he was for this school year. That's not -- that was not in his best interest and that was what the team decided in October 2015.

MR. SEAT: Okay. Anything else?

MR. RUBENSTEIN: No, I have nothing else.

MR. SEAT: Okay. So coming back for your final thoughts, Mr. Nabors.

MR. NABORS: Yeah, I think we'll just start with P-2-5. And the IEP establishes that [redacted] is in the eighth grade at LaSalle-Backus Educational -- in a self-contained special education class for students with a disability classification of emotional disturbance. So --

MR. SEAT: Why does that say that? I mean it -- this is when he's in ninth grade at CHEC. I mean concerning the -- look at page 5 and it says that he's in the eighth grade at LaSalle.

MR. NABORS: Yes, this IEP was designed to be implemented in emotional disturbance classroom when he was at LaSalle-Backus obviously. But what they decided to do is just transpose all of the goals straight over into when he was at CHEC. I understand a lot of paperwork people to do, sometimes there's oversight.

But the problem is that this IEP when it was designed at LaSalle-Backus was to be implemented in the BES program there, the ED program there. And I understand DCPS would like you to just look at the LRE requirements on page 2-8 and say, "Not only is this all that matters in the IEP, but this is the placement too." It's not only those. You have to look at the whole thing, what are the goals, what's the entire educational experience that the child isn't doing [sic]. And that's what the placement is. And the placement at LaSalle-Backus was BES for emotional disturbance.

So when they came over and they put him in an SLS program, which is inherently different -- it's for an entirely different purpose and goal.

MR. SEAT: Right.

MR. NABORS: It's to provide the structure and

scaffolding for students who need specific learning supports. Then it was per se a violation right there. The parent should have been involved in the process. Even if it was -- but I understand that that's technically not before you, but --

MR. SEAT: So you know that [redacted] did well. You still view it as being a violation?

MR. NABORS: I think an emotional outburst where he physically assaults another student isn't doing too well. And he physically assaulted another student who wasn't -- or shouldn't have been in the same setting as [redacted]

MR. SEAT: But I mean that seems like it was just the first of ongoing challenges that are natural with the disability that he has.

MR. NABORS: I'm just saying that it's inevitable I guess.

MR. SEAT: Let me -- after he's moved in BES, he had lots of altercations, physical altercations.

MR. NABORS: So why would you put him in an SLS program I guess is our point. The SLS students aren't known for being violent. They aren't known for emotional

or physical outburst. I mean we have a BES program, that's kind of what it's designed for is when students have these kinds of outbursts.

So on the front end, somebody had to stop for a second and say, "Wait a minute." And admittedly, AJ is pretty well known through DCPS and you could take judicial notice of all of the proceedings that have happened before with AJ. So they knew who this student was. Again, why on earth would you put him in an SLS program?

MR. SEAT: And your point earlier was that that might have been worst for the other SLS students, that he may have been the one that was more aggressive and tougher.

MR. NABORS: Yeah.

MR. SEAT: And so, you know, the question here today is whether there's a violation for [redacted] -- for him to be put in SLS.

MR. NABORS: Sure. He shouldn't have ever been put into a program for students with specific learning disabilities -- learning supports.

MR. SEAT: But did that deny him a meaningful education?

MR. NABORS: Right. Because it's like saying, "Oh, you have a disability, you go there." And so this idea of warehousing children with disabilities. That's the whole thing that gave rise to the IDEA.

MR. SEAT: And so as Mr. Rubenstein said, once the disability gets him in the door then he's supposed to go wherever it works best and not be based just on the fact that he's ED, so he has to go to an ED place.

MR. NABORS: Well, yeah. But it didn't work best. We had to move him.

MR. SEAT: Right.

MR. RUBENSTEIN: And the whole idea is that the parent was supposed to be involved in that. And had the parent been involved in that, we wouldn't have had an issue. But DCPS decided that they were going to unilaterally place him in this SLS program, and that was a violation. If DCPS wants to go rouge and not involve the parent in the placement process, okay, but you do it at your own risk and the risk of violation of the IDEA, putting the student in the wrong setting. And that's exactly what happened.

MR. SEAT: Any other points you want to make

about the closing --

MR. NABORS: Yeah.

MR. SEAT: -- from Mr. Rubenstein?

MR. RUBENSTEIN: Just about the Southeast Community College case real quick. That case actually dealt with a deaf student who wanted to be a nurse and they denied her admission not just on the fact that she was deaf, but on the assessment that in terms of the profession of nursing she would not able -- be able to ever be a nurse because of her disability.

So they said it's not that you have this disability that's going to prevent you from learning. It's that you're never going to be able to work in this profession. It was a physical limitation that the Supreme Court said that's what's inhibiting you from doing this.

It's like telling somebody that doesn't have a really steady hand that they can't be a surgeon. That happens all the time. I mean it's -- you know, some people are born with it and some people aren't. In her case it was unfortunate. But that's easily distinguishable from this case, where AJ is capable of performing there.

And if we look at the WJ III at -- you see when he was in eighth grade, he was scoring above the 10th grade in math. I mean that's two grade levels ahead in spite of the fact that he had almost failed the eighth grade, Ms. Smith testified to. And you can look at the records that happened in the Blackman/Jones action, they repeatedly expelled him. I mean he was constantly out of Cesar Chavez.

So when you're looking at that kind of achievement in the face of that kind of adversity, you're talking about a lot of aptitude there. And I think that we really should take that into account or assume, you know, "What can the student handle?"

To bring this all back down: we want an order that would require the IEP team to consider these options on this. Because right now when it comes down to it, the option is this: you can be in AP or you can get your 27-1/2 hours of services. You can be in AP, but you have to take a cut in hours. And that's unacceptable. He shouldn't have to choose between the AP courses and receiving the full allotment of services, especially when it would be so easy for them to have an AP teacher rotate

into his BES cohort.

MR. SEAT: Okay. Anything else?

MR. NABORS: No, sir.

MR. SEAT: Okay. I think that satisfies all my questions and concerns. So if we're ready to wrap this up, let me finish with a couple of comments. So during this hearing each party had the opportunity to introduce documents into evidence, present witnesses, cross examine the other party's witnesses and make objections. Each party was allowed to make a brief opening and closing statement.

As indicated, the hearing has been tape-recorded. Either party may request a copy of the tape recording or written transcript after the hearing is completed by writing to the Office of Dispute Resolution.

And a final issue will be -- a final decision will be issued to the parties no later than April 19th and I hope sooner.

And -- so I mean that does raise to my mind the question of when you will have anything you want to submit to me. And you talked about wanting writing closings. I'm not seeing the need for too much other than the

citations that were mentioned.

MR. NABORS: We can do that.

MR. RUBENSTEIN: I mean with parentheticals.

MR. SEAT: Yes. And I mean I'm open to --

MR. NABORS: Through quotes only? Okay.

MR. SEAT: I'm open to more, but I'm not really sure if I see the need unless you want to --

MR. NABORS: That's fine.

MR. SEAT: I mean I'm open to it, so -- but I think this has been helpful doing it orally and being able to have the interaction. And I think you both have done a good job presenting your cases. So then the cites would be handy to get them in today or tomorrow even, but they are not due technically until Monday at 11:59 --

MR. RUBENSTEIN: Okay.

MR. SEAT: -- by the prehearing order. So final decisions of special education impartial hearing officers may be appealed to a State or Federal Court of competent jurisdiction within 90 calendar days from the date of decision.

And before we close the record, are there any other matters from Petitioner --

MR. NABORS: No, sir.

MR. SEAT: -- or from Respondent?

MR. RUBENSTEIN: I never provided the disposition form, did I?

MR. SEAT: I think you did.

MR. RUBENSTEIN: Okay.

MR. SEAT: I think someone did.

MR. NABORS: You tabbing on yourself? Come one man.

MR. RUBENSTEIN: No, I'm just -- because I remembered we had that discussion.

MR. SEAT: Oh, you know something --

MR. RUBENSTEIN: And I know that Ms. Cogdell was a bit late in uploading. So --

MR. SEAT: Yeah, I think it may still be out there in the --

MR. RUBENSTEIN: I'll get that to you --

MR. SEAT: No, that would be great.

MR. RUBENSTEIN: -- when I get back to the office.

MR. NABORS: And so I want to check and make sure that Ms. Smith's mailing address hasn't changed since

the complaint was filed. The office sends out a certified copy and --

MR. NABORS: Can you just read it aloud so that we have --

MR. SEAT: I don't have it here. I can dig it out. But is it --

MS. SMITH: It's 206 Webster Street --

MR. SEAT: Are you at the same place you were for the last 3 months or --

MS. SMITH: Three months. Yeah, I've been here since December.

MR. SEAT: Okay, yeah. So that would be the same. I presume you all have the current address on the complaint.

MR. RUBENSTEIN: Yes, sir. Well --

MR. SEAT: Is that safe?

MR. NABORS: Why don't you pull up the complaint? I want to check real quickly. That's not a terrible idea.

MR. SEAT: And -- so they send out the HODs by certified mail I understand, although you will probably get it much faster from your counsel by e-mail.

And then there's a survey that the office appreciates people filling out and putting into the locked confidential box out there if you want to -- for the parent, for the counsel.

MR. NABORS: It was, but 206 Webster was on the complaint. So it's --

MR. SEAT: It's the right address there. And I don't know, I do need another copy. And so the hearing in the matter of student [redacted] Case Number 2016-0023 on March 25, 2016 in room number 2006 is now adjourned at 3:15 p.m. And I thank you for your participation.

MR. NABORS: Thank you.

MS. SMITH: Thank you.

MR. RUBENSTEIN: Thank you.

MR. SEAT: We're off the record.

(Whereupon, at approximately 3:15 p.m., the HEARING was adjourned.)

* * * * *