| | |
|---|---|
| LASHAWN SMITH,<br><br>   *Plaintiff*,<br><br> v.<br><br>DISTRICT OF COLUMBIA,<br><br>   *Defendant*. | Civil Action No. 16-1386 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff LaShawn Smith brings this action on behalf of her son A.J. to challenge various decisions by District of Columbia Public Schools ("DCPS") regarding A.J.'s education. Smith first asserts that DCPS failed to provide her son with a free and appropriate public education in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* She also contends that DCPS violated both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, for failing to offer A.J. Advanced Placement classes outside of the general education setting. Both parties moved for summary judgment. Magistrate Judge Deborah A. Robinson, having been referred the case, issued a Report and Recommendation ("R&R") dismissing Smith's IDEA claim for failure to exhaust and declining to address Smith's remaining claims.

For the reasons that follow, the Court will **REJECT** the Magistrate Judge's R&R, Dkt. 17. The Court will, instead, **GRANT** in part and **DENY** in part Smith's motion for summary judgment, Dkt. 10, and the District of Columbia's cross-motion for summary judgment, Dkt. 12. In particular, the Court will grant the District of Columbia summary judgment on Smith's claims

under the ADA and the DCHRA. With respect to Smith's IDEA claim, the Court will remand the matter to the Hearing Officer for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Statutory Background

The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education" ("FAPE") that includes "special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). To that end, the IDEA provides procedural protections for disabled students, confers a substantive right to a FAPE, and sets forth dispute resolution procedures in case a disabled student's parents and his school disagree on the assistance that IDEA requires the school to provide.

Once a child has been "identified as disabled," his school "must convene a meeting of a multidisciplinary team to develop" an Individualized Education Program, or "IEP." *Z.B. by & through Sanchez v. District of Columbia*, 92 F. Supp. 3d 300, 302 (D.D.C. 2018). The IEP is "the centerpiece of the statute's education delivery system for disabled children," *Honig v. Doe*, 484 U.S. 305, 311 (1988), and must be "tailored to [the] disabled child's needs," *Alston v. District of Columbia*, 439 F. Supp. 2d 86, 90 (D.D.C. 2006) ("*Alston I*").

An IEP provides "a comprehensive statement of the educational needs of a handicapped child," *Leonard v. McKenzie*, 869 F.2d 1558, 1560 n.1 (D.C. Cir. 1989) (quoting *Sch. Comm. of the Burlington v. Dept. of Educ.*, 471 U.S. 359, 368 (1985)), as well as "the specially designed instruction and services that will enable the child to meet [his educational] objectives," *Honig*, 484 U.S. at 311. An IEP "sets out, in writing, the student's existing levels of academic and functional performance, establishes appropriate goals, and describes how the student's progress toward those goals will be measured." *Z.B. v. District of Columbia*, 888 F.3d 515, 519 (D.C. Cir.

2018) (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(III)).  In addition, the IEP must describe "the special education and related services . . . to be provided to the child . . . to advance appropriately toward attaining the annual goals."  20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV).  Special education consists of "specially designed instruction . . . to meet the unique needs of a child with a disability," 20 U.S.C. § 1401(29), while related services are those support services that are "required to assist [the] child . . . to benefit from" that instruction, 20 U.S.C. § 1401(26)(A).  Once an IEP is in place, the child's school system must comply with its terms.  *See* 20 U.S.C. § 1401(9)(D).

In addition to these procedural protections, the IDEA guarantees disabled children a substantive right to a FAPE.  *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 201–04 (1982).  A child has received a FAPE if his "IEP sets out an educational program that is 'reasonably calculated to enable [him] to receive educational benefits.'"  *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 996–97 (2017) (quoting *Rowley*, 458 U.S. at 207).  The Supreme Court recently clarified the "standard [for] evaluat[ing] the adequacy of the education provided" by a school system: "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 998–99.  "To the maximum extent appropriate," the school must educate the child in the "[l]east restrictive environment," or, in other words, "with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).

Finally, "[w]hen disagreement arises" over "what a child's IEP should contain," the IDEA permits the child's parent or parents to request a "due process hearing" before a state or local educational agency.  *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1415(f)(1)(A), (g)).

The losing party may seek judicial review of the administrative determination in state or federal court. *Id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

**B.      Factual Background**

A.J. is "bright," "learns quickly," and "perform[s] at or above grade level," AR 8 (Hearing Officer's decision), but he has an emotional disturbance that "leads to frequent emotional dysregulation" and behavioral issues, AR 6.  In school, he has "frequent conflict[s] with peers and teachers, with physical altercations [occurring] 2-3 times per week." *Id.*  A.J.'s emotional disturbance also interferes with his education.  When his "emotions are d[y]sregulated," he is "unavailable for learning;" when he "has to be removed from the classroom . . . to de-escalate following an altercation," he cannot "access[] the general education curriculum."  AR 26.  A.J., however, "can do his work when he chooses to," AR 9, and has "had fewer behavioral challenges in the classes that he [finds] rigorous," AR 8.  A.J. has also had "infractions in hallways, the cafeteria, and the gym," and "there is no question [these conflicts were due to] his academic content boring him." *Id.*

In the fall of 2015, at the beginning of A.J.'s freshman year of high school, DCPS assigned A.J. to the Columbia Heights Education Campus.  Dkt. 1 at 3 (Compl. ¶ 9).  The IEP then in effect, which was developed at the end of the previous academic year in March 2015, "indicated that '[A.J.] requires a self-contained environment in order to succeed academically and behaviorally.'"  AR 154–55.  The March 2015 IEP also provided for 26.5 hours per week of specialized instruction outside the general education setting.  AR 154.

A.J. was initially placed in the Specific Learning Support ("SLS") program, AR 8, a "self-contained special education classroom setting," AR 155, that is "designed for students with learning disabilities," Dkt. 10-2 at 2 (Pl.'s SUMF ¶ 3).  A.J., however, does not have a learning

disability. *Id.* (Pl.'s SUMF ¶ 3). A.J.'s IEP team met on October 8, 2015, and the resulting IEP carried forth the two provisions from the March 2015 IEP: the need for a "self-contained environment" and 26.5 hours per week of specialized instruction. *See* AR 28–29; *see also* AR 242 (Hrg. Tr. 8:8–18). At the meeting, A.J. indicated that he wished to participate in general education classes, but the IEP team concluded "that he was not ready due to his behavior." AR 155.

Toward the end of October 2015, A.J. began "having fights with another student," AR 8, and was subsequently moved from the SLS program to the Behavior and Education Support ("BES") program, *id.*; AR 155. The BES program provides full-time instruction "outside the general education setting with supports for students with emotional disabilities." AR 88 (due process complaint). The SLS and BES programs were led by "the same special education teachers," and A.J.'s instructional "content remained the same," except, in the BES program, A.J. "had a behavior technician to work with him." AR 8. The other six students in the BES program were a year ahead of A.J. *Id.* As a result, A.J. was given "9th grade work while his [BES classmates] were given 10th grade instruction." AR 88. A.J. received "personalized attention," and his work could "easily be adjusted and made more challenging for him." AR 8.

In November 2015, Plaintiff LaShawn Smith, A.J.'s mother, requested that A.J. be evaluated for placement in general education Advanced Placement ("AP") courses. *See* AR 8; AR 89. DCPS informed her that an evaluation was not required to take those classes but that "educational programming decisions were made by the IEP team." AR 89. Smith was also informed that "the hours on [A.J.'s] IEP would have to be reduced for him to attend AP classes." AR 8. Smith "did not agree to forfeit" the hours, and so A.J. "did not receive any form of advanced curriculum." Dkt. 10-2 at 2 (Pl.'s SUMF ¶ 9).

On February 4, 2016, Smith filed a due process complaint against DCPS with the District of Columbia Office of the State Superintendent of Education ("OSSE"). *See* AR 86–92. The complaint asserted that A.J.'s initial placement in the SLS program was inappropriate and therefore amounted to a denial of a FAPE in violation of the IDEA. Smith argued that the placement was inappropriate because the SLS program was "designed to accommodate students with specific learning disabilities," and A.J. has an emotional disturbance, not a learning disability. AR 87–88. The complaint also asserted that DCPS, "[i]n an attempt to remedy [its] initial placement error," compounded its mistake by "remov[ing] A.J. from an age-appropriate classroom" through the SLS program and placing him in the BES program, where his peers were a year ahead of him. AR 91. Because of this discrepancy, Smith argued, A.J.'s placement in the BES program was also inappropriate and violated the IDEA. AR 90. Finally, Smith maintained that DCPS violated the ADA by failing to provide AP classes outside the general education setting. AR 90–91.

The Hearing Officer issued his decision on April 2, 2016. *See* AR 3–17 (Hearing Officer Determination). He dismissed Smith's ADA claim without prejudice on the grounds that he "lack[ed] subject matter jurisdiction." AR 199 (citing 34 C.F.R. 300.507(a)(1)); *see also* AR 5 n.4. Next, he concluded that A.J.'s placement in the SLS and BES programs were "sufficient to implement [the] IEP and provide a FAPE." AR 12. Finally, the Hearing Officer concluded that DCPS's failure to enroll A.J. in AP classes did not deny A.J. a FAPE. AR 13.

## C.    Procedural History

Smith filed this action on A.J.'s behalf in June 2016. Dkt. 1. The complaint asserts that DCPS denied A.J. a FAPE in violation of the IDEA "[b]y initially placing A.J. in a SLS classroom" and "[b]y moving A.J. out of an age-appropriate classroom" and into a BES

classroom with students a year ahead of him. *Id.* at 5 (Compl. ¶¶ 27–28). In addition, Smith contends that DCPS's failure to offer AP classes outside the general education setting violated both the ADA and the DCHRA. *Id.* at 6–7 (Compl. ¶¶ 32–33, 38). Smith asks that the Court (1) reverse the Hearing Officer's determination and remand the matter to the Hearing Officer "for an appropriate determination of compensatory education;" (2) declare that DCPS violated the IDEA, ADA, and DCHRA; and (3) award compensatory and punitive damages of $50,000. *Id.* at 7–8 (Compl. Prayer).

The case was referred to a magistrate judge for full case management, Dkt. 4, and both parties moved for summary judgment, Dkt. 10; Dkt. 12. On March 20, 2018, the Magistrate Judge filed her R&R, Dkt. 17, and, subsequently, both parties filed objections to the R&R, Dkt. 21; Dkt. 23.

## II. LEGAL STANDARD

Once a magistrate judge has issued her R&R, the parties may file objections. *See* Fed. R. Civ. P. 72(b)(2). The Court must then "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to" and may "accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3).

The R&R here addresses the parties' competing motions for summary judgment. A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if she can "show[] that there is no genuine dispute as to any material fact and [that she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in her favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

In reviewing the factual findings and legal conclusions of the Hearing Officer in an IDEA case, the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Where, as here, neither party submits additional evidence, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on

the basis of the administrative record." *Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012) (citation omitted).  The Court "must give 'due weight' to the hearing officer's determinations." *Z.B.*, 888 F.3d at 523 (quoting *Rowley*, 458 U.S. at 206).  That deference, however, falls short of that which is "'conventional in administrative proceedings,' especially when the decision is insufficiently supported by fact or reasoning." *Id.* (quoting *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005)).  A hearing decision "without reasoned and specific findings deserves little deference." *Reid*, 401 F.3d at 521 (citation omitted).

## III.  ANALYSIS

### A.  IDEA Claim

With respect to Smith's IDEA claim, the Magistrate Judge recommended that the Court dismiss the claim on the grounds that Smith had failed to exhaust her administrative remedies. The Magistrate Judge construed Smith's motion as seeking summary judgment on the following claim: that "[t]he SLS classroom was not A.J.'s least restrictive environment, nor tailored for [A.J.] to meet personally challenging objectives."  Dkt. 17 at 10 (quoting Plaintiff's motion for summary judgment).  This claim, the Magistrate Judge found, was not raised in Smith's due process complaint and not addressed by the Hearing Officer.  *Id.* at 10–11.  The Magistrate Judge concluded that Smith, accordingly, had failed to exhaust her administrative remedies.  *Id.* at 11.

According to Smith, her claim is that DCPS denied A.J. a FAPE by virtue of "A.J.'s inappropriate placement in the SLS and BES settings."  Dkt. 21 at 9.  She further asserts that she has consistently raised this claim at every stage of the administrative and judicial process.  *Id.* The Court agrees that the due process complaint Smith filed with the OSSE, the complaint she filed to commence this action, and her motion for summary judgment all challenged the

lawfulness, under the IDEA, of DCPS's decision to place A.J. in the SLS and BES programs.
*See* AR 86–91 (due process complaint); Dkt. 1 at 5 (Compl. ¶¶ 25–28) (alleging that the SLS and
BES settings were "not . . . appropriate placement[s]" and that the placements "denied A.J. a
FAPE, and violated the IDEA"); Dkt. 10-1 at 3 (motion for summary judgment) ("[DCPS]
denied A.J. a FAPE by placing him in an SLS classroom . . . and by placing him in a BES
classroom . . . ."). The Hearing Officer's determination squarely addressed Smith's challenge to
A.J.'s placements. *See* AR 11–14. Because Smith exhausted her administrative remedies and
because briefing on her IDEA claim is complete, the Court will reject the R&R's disposition of
this claim and proceed to address it on the merits.

  1. *IEP Standard*

  After this case was filed but before the parties moved for summary judgment, the
Supreme Court set forth the standard for determining the substantive adequacy of an IEP. In
*Endrew F. v. Douglas County School District RE-1*, the Court held that an IEP must be
"reasonably calculated to enable [the] child to make progress appropriate in light of the child's
circumstances." 137 S. Ct. at 999; *see id.* at 1001 ("[A]dequacy . . . turns on the unique
circumstances of the child."). This "fact-intensive" standard recognizes that "crafting an
appropriate program of education" requires "the expertise of school officials" as well as "the
input of the child's parents or guardians." *Id.* at 999.

  If a student is "fully integrated in the regular classroom," which the IDEA requires
whenever possible, *Endrew F.*'s "appropriate progress" standard "typically" requires that his IEP
be "reasonably calculated to enable the child to achieve passing marks and advance from grade
to grade." *Id.* (quoting *Rowley*, 458 U.S. at 203–04). This metric will apply to "most children"
because, in most cases, "a FAPE will involve integration in the regular classroom" supplemented

by "individualized special education." *Id.* at 1000. But when a student's disability prevents him from participating in general education courses, "his IEP need not aim for grade-level advancement." *Id.* Instead, the IEP must be "appropriately ambitious in light of his circumstances" and must give him "the chance to meet challenging objectives." *Id.* This standard, of course, requires more than mere "*de minimis* progress." *Id.* at 1001.

The Supreme Court and the D.C. Circuit have set forth several principles governing judicial review of the adequacy of an IEP. First, the inquiry centers on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999. A reviewing court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *Rowley*, 458 U.S. at 206. This deference "is based on the application of expertise and the exercise of judgment by school authorities." *Endrew F.*, 137 S. Ct. at 1001. Second, because the deference the Court owes school authorities is a product of their expertise, "[a] reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions," and this explanation should show why "the IEP is reasonably calculated" to ensure that the child "make[s] progress appropriate in light of his circumstances." *Id.* at 1002. Third, in assessing the IEP, the court may not consider "evidence that was not before the IEP team at the time the IEP was adopted." *Z.B.*, 888 F.3d at 526 (citation omitted). An IEP must be evaluated in light of the information that was available "at the time [it] was created," not "with the benefit of hindsight." *Id.* at 524 (citation omitted). But evidence that "post-dates" the IEP "is relevant . . . to whatever extent it sheds light on whether the IEP was objectively reasonable at the time it was promulgated." *Id.* (internal quotation marks and citation omitted). Finally, the adequacy of an IEP must be assessed by reference to "what [the school] actually offered, not what it is capable of providing." *Id.* at 526 (internal quotation marks and citation omitted).

2. *A.J.'s Placement in the SLS and BES Programs*

Smith contends that DCPS denied A.J. a FAPE by inappropriately placing him in the SLS

program and then in the BES program with students from another grade. Dkt. 10-1 at 3, 5. The

Hearing Officer framed Smith's claim as follows:

> Whether [DCPS] denied [A.J.] a FAPE by placing [A.J.], who is intellectually
> gifted but limited in accessing general education by his emotional disturbance, in
> (a) a Specific Learning Support ("SLS") program which is designed for children
> with specific learning disabilities, which [A.J. does] not have, and/or (b) a Behavior
> & Education Support ("BES") program in which [his] peers . . . were all a year
> ahead of him, causing behavioral issues.

AR 5. The Hearing Officer articulated two slightly different standards for assessing Smith's

claim: first, that DCPS need only provide "an appropriate education which allows the child to

receive a meaningful educational benefit," AR 12 (citation omitted); second, that DCPS need

only "provide a 'basic floor of opportunity' for [A.J.]," AR 13 (quoting *Rowley*, 458 U.S. at

201). As a threshold matter, these descriptions of the relevant standard omit a critical feature:

the requirement that the specialized instruction and related services be "*individually designed* to

provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201 (emphasis

added). Both the Supreme Court and the D.C. Circuit, as discussed above, have reaffirmed the

duty to adapt a child's education to "the unique circumstances of [that] child." *Endrew F.*, 137

S. Ct. at 1001; *see Z.B.*, 888 F.3d at 523. That education, moreover, must be "appropriately

ambitious in light of his circumstances," *Endrew F.*, 137 S. Ct. at 1000, and must be "reasonably

calculated and to enable" the student "to make progress appropriate in light of [those]

circumstances." *Id.* at 999. Ultimately, "every child should have the chance to meet challenging

objectives." *Id.* at 1000.

The Hearing Officer concluded that both the SLS and BES programs were "sufficient to

implement [A.J.'s] IEP and provide a FAPE." AR 12. He emphasized that A.J.'s IEP "simply

call[ed] for him to be out of general education for 26.5 hours/week in a self-contained classroom" and that both programs satisfied this requirement. *Id.* He also pointed to testimony from Rasheeda Hinkson, the assistant principal of special education and response to intervention at A.J.'s school, *see* AR 310 (Hrg. Tr. 76:13–15). Hinkson testified that A.J. "can do his academic work when he chooses to" and that A.J. "performed reasonably well academically," albeit "inconsistent[ly]" during the 2015-2016 school year (A.J. received two As and two Cs in the first term, but, in the second term, both As dropped to Cs and one of the Cs rose to an A). AR 12. In addition, the Hearing Officer noted that school personnel were "diligently working with [A.J.] . . . to address his physical and verbal aggression." AR 13. Finally, he observed that Smith had "not assert[ed] that [A.J.'s] classmates were at a notably different intellectual level" than A.J. AR 12. The Hearing Officer concluded that, "[t]aken as a whole," A.J. "received an appropriate education with meaningful educational benefit." AR 13.

a. SLS Placement

With respect to A.J.'s placement in the SLS classroom, the Hearing Officer erred in concluding that that program satisfied DCPS's obligation to provide a FAPE to A.J., who did not have a learning disability. An IEP and the services ultimately provided "must be tailored to the student's . . . known needs at the time" of the challenged decision. *Z.B.*, 888 F.3d at 523. When A.J. was assigned to the SLS classroom at the beginning of his freshman year, DCPS knew that he did not have a learning disability. DCPS also knew that, during the prior school year, he had been in a "self-contained [s]pecial [e]ducation class for students with a disability classification of [e]motional [d]isturbance." AR 26. Finally, A.J.'s school already had the BES Program in place, which was a "self-contained [s]pecial [e]ducation class for students with a disability

classification of [e]motional [d]isturbance." AR 58. Nonetheless, DCPS placed A.J. in the SLS program.

The Court agrees with Smith that the SLS classroom was not "tailored" to A.J.'s needs and that it failed to provide A.J. with "personally challenging objectives." Dkt. 10-1 at 4. Taken as a whole, A.J.'s IEP required that A.J. receive instruction and services that were tailored to his disability. *See* AR 22 (classifying A.J.'s disability as "Emotional Disturbance"). The IEP explicitly described how A.J.'s emotional disturbance hindered his ability to learn: when his "emotions are d[y]sregulated," A.J. is "unavailable for learning." AR 26. And when his emotional disturbance leads to conflict with other students or teachers, A.J. "has to be removed from the classroom," which, for obvious reasons, prevents him from "accessing the general education curriculum." *Id.* The IEP concluded that A.J. "requires a self-contained environment in order to succeed academically *and behaviorally*." AR 29 (emphasis added). It should come as no surprise that A.J.'s IEP required DCPS to accommodate his particular disability: "[a] focus on the particular child is at the core of the IDEA." *Endrew F.*, 137 S. Ct. at 999. The SLS program did not meet that requirement: it was not designed to accommodate the unique needs of a child with *emotional* disabilities but, rather, was designed for children with *learning* disabilities. The Hearing Officer's determination does not discuss any evidence suggesting that, while in the SLS classroom, A.J. received assistance that was tailored to address and mitigate his disability. Accordingly, the Court concludes that DCPS denied A.J. a FAPE by placing him in the SLS program.

The Hearing Officer's decision rested primarily on his conclusion that the SLS classroom satisfied A.J.'s IEP, which "simply call[ed] for him to be out of general education for 26.5 hours/week in a self-contained classroom." AR 12. Although the Hearing Officer is correct that

the IEP did not explicitly mandate placement in the BES program, the IEP—for reasons described above—plainly contemplated that the "self-contained classroom" environment it specified would address A.J.'s emotional disturbance: it made clear that A.J. "require[d] a self-contained environment in order to succeed academically *and behaviorally*," AR 29 (emphasis added). The Hearing Officer is also correct that the IDEA does not require a school "to place . . . students with similar disabilities together." AR 12. But wherever those students are placed, whether together or not, they must receive a program of education that is "reasonably calculated to enable [them] to make progress appropriate in light of [their] circumstances." *Endrew F.*, 137 S. Ct. at 999. Finally, although courts must "give due weight to the administrative proceedings and afford some deference to the expertise of the hearing officer," *Gill v. District of Columbia*, 751 F. Supp. 2d 104, 109 (D.D.C. 2010) (citation and internal quotation marks omitted), a decision that lacks "reasoned and specific findings" is given little weight, *Reid*, 401 F.3d at 521 (citation omitted). The Hearing Officer's decision here "lack[s] 'a detailed and reasoned explanation of how the evidence supports'" the conclusion that DCPS fulfilled its duty to provide A.J. with a FAPE by placing him in the SLS program. *Z.B.*, 888 F.3d at 521 (citation omitted). For the same reason, although educational decisions typically involve "the application of expertise and the exercise of judgment by school authorities," DCPS has failed to offer the "cogent and responsive explanation for [its placement] decision[]" that would entitle it to deference. *Endrew F.*, 137 S. Ct. at 1001–02; *see also Z.B.*, 888 F.3d at 526 (noting the lack of clarity on "what ground DCPS may have reasonably concluded that the IEP was tailored to [the student's] needs").

The record indicates that the SLS environment—targeted as it was at learning disabilities—was not "reasonably calculated to enable [A.J.] to make progress appropriate in

light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999. Accordingly, the Court cannot sustain the Hearing Officer's conclusion that DCPS satisfied its obligations under the IDEA in placing A.J. in the SLS program. The Court will **GRANT** Smith's motion for summary judgment, Dkt. 10, will **DENY** DCPS's motion for summary judgment, Dkt. 12, and will **REMAND** the matter to the Hearing Officer for a determination of the appropriate remedy.

    b.  BES Placement

With respect to A.J.'s placement in the BES program, the Hearing Officer found that, because the other six students in the BES program were a year ahead of A.J., he received "personalized attention" and "his work [could] easily be adjusted and made more challenging for him." AR 8. The SLS and BES programs "had the same special education teachers," and A.J.'s "content remained the same." *Id.* During the due process hearing, Hinkson testified that A.J. was "supported by both a special education teacher and/or a special education instructional aide as well as a behavior tech." AR 340 (Hrg. Tr. 106:11–20).

Smith does not dispute the Hearing Officer's factual findings, but she argues that they cut against, not in favor of, DCPS. She contends that A.J.'s placement in the BES program was improper because "A.J. was the only ninth grade student among a class of tenth graders." Dkt. 10-1 at 5. As a result, she continues, A.J. was "forced to share a single special education teacher with the rest of the class[,] [which] was being taught completely different material." *Id.* But the critical inquiry under the IDEA is whether the BES program was "reasonably calculated to enable [A.J.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999. The mere fact that A.J.'s content differed from that of the other students, accordingly, does not, without more, establish that DCPS failed to provide a FAPE.

This conclusion does not end the matter, however, because Smith advances a second, more nuanced argument for why A.J. could not receive a FAPE in the BES classroom: given that there was "only one instructor qualified to provide specialized instruction" in the BES classroom, Smith asserts that "[i]t was impossible for DCPS to simultaneously provide A.J. with 26.5 hours of specialized instruction in ninth grade content and the rest of the class with 26.5 hours of specialized instruction in tenth grade content." Dkt. 13 at 8. At the due process hearing, the Hearing Officer asked, "[H]ow is the curriculum adapted by the special education teacher inside the setting for [A.J.]?" AR 342 (Hrg. Tr. 108:13–15). Hinkson responded that it varied depending on the subject. *See* AR 342–46 (Hrg. Tr. 108:16–112:11). For English, A.J. wasn't "taking the full English class," but "a reading support class" for "students who are not reading at grade level and . . . need support [with] reading comprehension or reading fluency." AR 342 (Hrg. Tr. 108:16–21). For science, the Hearing Officer asked how the specialized instruction worked given that "there's only one special ed[ucation] teacher" and that "[t]he 10th graders" in the BES program were "taking chemistry at the same time that [A.J. was] taking biology." AR 344 (Hrg. Tr. 110:3–10). Hinkson responded as follows:

> [T]here's also two other individuals in the room. So . . . the content is delivered to him by the teacher. There are different rotations in the room. One rotation [has] the teacher . . . leading the lesson. Another . . . rotation [has] the instructional aide . . . supporting [A.J.] to make sure that he is doing the activities or whatever the next part of the lesson is, independently to support him.

AR 344 (Hrg. Tr. 110:15–22). Hinkson conceded that the instructional aide and behavior tech were not considered "highly qualified for specialized instruction" under OSSE regulations. AR 345–46 (Hrg. Tr. 111:1–112:11).

The Hearing Officer concluded that the BES program complied with A.J.'s IEP, which required 26.5 hours per week of specialized instruction in a self-contained environment, AR 12,

but his decision does not recount the factual basis for this conclusion. Instead, the decision notes that Smith "did not assert that [A.J.'s] classmates were at a notably different intellectual level." *Id.* That response fails to address Smith's contention that one DCPS teacher could not simultaneously teach two different subjects. The argument is not that A.J.'s classmates were on a "different intellectual level" than A.J. Rather, Smith contends that the BES program could not have delivered the required number of hours of specialized instruction in ninth-grade content given that (1) there was only one educator qualified to deliver specialized instruction for all seven students and (2) the six other students were receiving tenth-grade content rather than ninth-grade content. *See, e.g.*, AR 88.

Based on the present record, the Court cannot conclude that the instruction A.J. in the BES classroom satisfied the dictates of his IEP. The Court, accordingly, will **DENY** Smith's motion for summary judgment, Dkt. 10, without prejudice, will **DENY** DCPS's motion for summary judgment, Dkt. 12, without prejudice, and will **REMAND** the matter to the Hearing Officer to reassess whether DCPS denied A.J. a FAPE by placing him in the BES program.

**B.     ADA Claim**

"Important as the IDEA is for children with disabilities, it is not the only federal statute protecting their interests." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017). In addition to her IDEA claim, Smith asserts that DCPS violated the ADA. Title II of the ADA provides, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The statute also requires public entities "to make 'reasonable modifications' . . . when necessary to avoid such discrimination." *Fry*, 134 S. Ct. at 749. "As a local government, the District of Columbia is a

public entity." *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 37 (D.D.C. 2008) ("*Alston II*").

To prevail on her ADA discrimination claim, Smith must demonstrate (1) that A.J. "is a qualified individual with a disability;" (2) that DCPS "denied [A.J.] the benefits of or prohibited [him] from participating in [its] services, programs[,] or activities;" and (3) that the "denial or prohibition was 'by reason of' [his] disability." *Alston II*, 561 F. Supp. 2d at 37 (quoting 42 U.S.C. § 12132); *see Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 267 (D.D.C. 2015). To establish causation, "'discrimination need not be the sole reason' for the exclusion of or denial of benefits." *Pierce*, 128 F. Supp. 3d at 266 n.10 (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002)); *see also Alston v. District of Columbia*, 770 F. Supp. 2d 289, 297 (D.D.C. 2011) ("*Alston III*").

According to Smith, DCPS concluded that A.J. was "qualified" to take AP classes because he "was offered admission into a variety of [AP] courses." Dkt. 10-1 at 7–8. Despite his eligibility, Smith continues, DCPS violated the ADA by offering these classes "exclusively in general education settings." *Id.* at 8. Because AP classes were not offered outside the general education setting, Smith continues, DCPS forced A.J. to make a lose-lose choice: either forgo AP classes that he was qualified to take or enroll in the general education AP classes without the behavioral supports necessary to succeed. *Id.* Smith concludes that DCPS, by "conditioning" A.J.'s ability to participate in AP classes on his "forfeiture [of his] IDEA rights" to a self-contained classroom with behavioral supports, discriminated against A.J. based on his disability in violation of the ADA.[1] *Id.*

---

[1] The "gravamen" of Smith's ADA claim is that DCPS denied A.J. a FAPE. *Fry*, 137 S. Ct. at 752; *see also* Dkt. 1 at 6 (Compl. ¶ 33) ("[DCPS] has denied A.J.'s participation in AP classes solely because he requires the accommodation of specialized instruction in an outside-the-

Smith's ADA claim founders at the first step because A.J. was not eligible for AP coursework.  To support her argument that A.J. was offered admission to AP courses, Smith relies on (1) the Hearing Officer's decision, AR 9–10; (2) an email from Hinkson to Smith, AR 85; (3) an argument made by Smith's counsel during the due process hearing, AR 253–60; and (4) testimony from A.J.'s community support worker during the due process hearing, AR 290–91.  None of this evidence, however, shows that A.J. was, in fact, ready for AP content.

*First*, the Hearing Officer's decision notes only that DCPS "informally discussed with [Smith] the possibility of [A.J.] . . . . taking AP English or AP Biology," AR 9, and that A.J. could not take AP Calculus "without first taking several prerequisites," AR 10.  The decision explains that A.J. "would need to complete Biology before attempting AP Biology;" that A.J.'s "reading and writing are also not strong enough for AP Biology;" that, although "[m]ath is a relative strength for [A.J.], . . . he ranks toward the bottom of his grade in [m]ath;" and that "his spelling skills and written fluency are below the level targeted in a grade-level general education setting."  AR 9–10.  The Hearing Officer, accordingly, concluded that "even if AP classes were otherwise necessary, . . . it would be premature to consider them at this time."  AR 14.  In short, far from confirming that A.J. was eligible for AP classes, the decision supports the opposite conclusion.

---

general-education environment.").  Smith could not have brought her ADA claim "if the alleged conduct had occurred at a public facility that was *not* a school," and "an *adult* at [A.J.'s] school . . . [could not] have pressed essentially the same grievance."  *Fry*, 137 S. Ct. at 756.  Because Smith's ADA claim "seek[s] relief for the denial of a FAPE," she needed to "exhaust the IDEA's procedures before filing an action under the ADA."  *Id.* at 752 (citing 20 U.S.C. § 1415(*l*)).  Smith has satisfied the IDEA's exhaustion requirement with respect to her ADA claim, and that claim, accordingly, is properly before the Court.  *See* AR 13–14 (Hearing Officer's conclusion that DCPS did not deny A.J. a FAPE in failing to provide "a full-time out of general education setting with advanced programming").

*Second*, the email from Hinkson to Smith does not assert that A.J. was ready for advanced content. Rather, it merely provides "clarification from [their] last meeting." AR 85. Hinkson explains that they previously "discussed . . . the possibility of lowering [A.J.'s] instructional hours so that he can attend inclusion classes." *Id.*

*Next*, Smith relies on her counsel's description of a Dear Colleague Letter from the Department of Education during the due process hearing. AR 253–60. The letter explains, "It is unlawful to deny a student with a disability admission to an accelerated class or program solely because of that student's need for special education or related aids and services, or because that student has an IEP . . . ." AR 232. The letter, however, adds the following caveat: "Please note that nothing in . . . Title II [of the ADA] requires schools to admit into accelerated classes or programs students with disabilities who would not otherwise be qualified for these classes or programs." *Id.* In addition, "schools may employ appropriate eligibility requirements or criteria in determining whether to admit students, including students with disabilities, into accelerated programs or classes." *Id.* During the hearing, Smith's counsel argued that DCPS's failure to offer AP classes outside the general education environment ran afoul of the Dear Colleague Letter, but he did not discuss or present any evidence that A.J. was "otherwise . . . qualified" for any AP class. *See* AR 253–60.

*Finally*, Smith cites testimony from Gerald Kelli, A.J.'s "community support worker with Community Connections." AR 288 (Hrg. Tr. 54:11–16). Kelli was "involved in most, if not all, of the meetings" involving A.J.'s education. AR 289 (Hrg. Tr. 55:10–14). When asked if he recalled "discussions about increasing the rigor of [A.J.'s] curriculum," Kelli responded:

> Yeah, we discussed . . . AP courses or [A.J.] being involved in some college[-]level courses and . . . getting him into the classes that would challenge him so he didn't have the outburst[s] that he was having. [But] [t]o my knowledge[,] . . . [the

proposals] were thrown out as good suggestions for [A.J.] and . . . he . . . stay[ed] in the same settings.

AR 290 (Hrg. Tr. 56:3–16). Kelli also testified that "everyone from teachers to school staff to [A.J.'s] mother . . . [said] they thought he would be able to handle the advanced work and the advanced curriculum satisfactorily." AR 290–91 (Hrg. Tr. 56:17–57:2). Kelli, however, does not work for A.J.'s school nor DCPS, has never worked as a teacher, and did not have "experience with A.J. in tutoring." AR 291–93. His testimony—while relevant to A.J.'s intellectual development—does not directly bear on A.J.'s eligibility to enroll in AP classes.

The only evidence that A.J. was qualified to take AP classes comes from Smith herself. As the Hearing Officer explained, both Hinkson and Smith "credibly testified that [A.J.] was not ready for general education classes." AR 14 n.63. Nonetheless, Smith also "insisted that [A.J.] was . . . 'ready for AP general education.'" *Id.* The basis for this opinion, however, remains unclear and, in any event, her assertion does not address the curricular prerequisites for particular AP classes. As a result, the only evidence before the Court shows that it was "premature to consider" enrolling A.J. in AP classes as the relevant time. AR 14. Given this evidence, no reasonable jury could find that A.J. was qualified to enroll in any AP course.

Accordingly, the Court will **DENY** Smith's motion for summary judgment and will **GRANT** the District of Columbia's cross-motion for summary judgment with respect to Smith's ADA claim.

## C. DCHRA Claim

Smith's claim under the DCHRA rests on grounds identical in relevant respects to those underlying her ADA claim. *See* Dkt. 1 at 6–7 (Compl. ¶¶ 36–38); Dkt. 10-1 at 9 ("Due to statutory overlap between Title II of the ADA and the DCHRA, the Court should [find both] an ADA violation and a DCHRA violation."); *see also Equal Rights Ctr. v. District of Columbia*,

741 F. Supp. 2d 273, 283 n.6 (D.D.C. 2010) (citing *Am. Council of the Blind v. Paulson*, 525

F.3d 1256, 1260 n.2 (D.C. Cir. 2008)); *see Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1,

5 (D.C. Cir. 2015).  The statutory provision on which Smith's claim is based is D.C. Code § 2-

1402.73, which provides that "[i]t shall be an unlawful discriminatory practice for a District

government agency or office to limit or refuse to provide any facility, service, program, or

benefit to any individual on the basis of [the] individual's actual or perceived . . . disability . . . ."

As discussed above in connection with Smith's ADA claim, no reasonable jury could conclude

that A.J. was eligible to take AP courses or that he was denied the opportunity to participate in

AP classes on the basis of his disability.

The Court will, accordingly, **DENY** Smith's motion for summary judgment on her

DCHRA claim and will **GRANT** the District of Columbia's cross-motion for summary judgment

as to this claim.

## CONCLUSION

For the reasons discussed above, the R&R is **REJECTED**.  Smith's motion for summary

judgment, Dkt. 10, and the District of Columbia's cross-motion for summary judgment, Dkt. 12,

are hereby **GRANTED** in part and **DENIED** in part.

In particular, it is hereby **ORDERED** that (1) with respect to Smith's IDEA claim based

on A.J.'s placement in the SLS program, Smith's motion for summary judgment, Dkt. 10, is

**GRANTED**, and the District of Columbia's cross-motion for summary judgment, Dkt. 12, is

**DENIED**; (2) with respect to Smith's IDEA claim based on A.J.'s placement in the BES

program, Smith's motion for summary judgment, Dkt. 10, and the District of Columbia's cross-

motion for summary judgment, Dkt. 12, are **DENIED** without prejudice; and (3) with respect to

Smith's claims under the ADA and DCHRA, Smith's motion for summary judgment, Dkt. 10, is

**DENIED**, and the District of Columbia's cross-motion for summary judgment, Dkt. 12, is

**GRANTED**.

It is further **ORDERED** that this matter is **REMANDED** to the Hearing Officer for a determination of (1) the appropriate remedy for A.J.'s placement in the SLS program and (2) whether DCPS denied A.J. a FAPE by placing him in the BES program.

**SO ORDERED**.

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: September 28, 2018